1   KATIE TOWNSEND (SBN 254321)
2   GABE ROTTMAN
    MARA GASSMANN
3   EMILY HOCKETT
4   THE REPORTERS COMMITTEE FOR
        FREEDOM OF THE PRESS
5   1156 15th Street NW, Suite 1020
6   Washington, D.C. 20005
    Telephone:  202.795.9300
7   Facsimile:  202.795.9310
8   Email:  ktownsend@rcfp.org

9   *Counsel for Amici Curiae*

10

11                  **UNITED STATES DISTRICT COURT**
12              **NORTHERN DISTRICT OF CALIFORNIA**
                    **SAN FRANCISCO DIVISION**
13

14   **U.S. NEWS & WORLD REPORT,**
     **L.P.**
15                                              Case No.  3:24-cv-00395-WHO
16              *Plaintiff,*
17       v.                                     **PROPOSED BRIEF OF AMICI**
                                                **CURIAE MEDIA**
18                                              **ORGANIZATIONS IN SUPPORT**
     **DAVID CHIU,** in his official capacity   **OF PLAINTIFF'S MOTION FOR**
19   as Attorney for the City and County of    **PRELIMINARY INJUNCTION**
     San Francisco, California,                 **AND IN OPPOSITION TO**
20                                              **DEFENDANT'S MOTION TO**
21              *Defendant.*                    **DISMISS AND TO STRIKE**
22
23                                              Judge William H. Orrick
                                                Hearing Date: April 10, 2024
24                                              Hearing Time: 2 p.m.
25
26
27
28
                                          i

# TABLE OF CONTENTS

**Page:**

CORPORATE DISCLOSURE STATEMENTS .........................................................III

TABLE OF AUTHORITIES .....................................................................................IV

STATEMENT OF INTEREST OF AMICI CURIAE ............................................. VII

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................................1

ARGUMENT ............................................................................................................4

I.      The City Attorney's subpoenas target non-commercial speech entitled to
        full First Amendment protection..........................................................................4

II.     The City Attorney cannot target a news outlet with subpoenas because he
        disagrees with its editorial viewpoint. ...............................................................10

III.    U.S. News' action to vindicate its First Amendment rights is ripe...................13

IV.     California's anti-SLAPP law is not a sword to be wielded by government
        officials to defend subpoenas to news organizations. .......................................17

CONCLUSION .......................................................................................................19

# CORPORATE DISCLOSURE STATEMENTS

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

The Media Law Resource Center has no parent corporation and issues no stock.

News/Media Alliance is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

The Reporters Committee for Freedom of the Press s an unincorporated association of reporters and editors with no parent corporation and no stock.

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Ariix, LLC v. NutriSearch Corp.*,
   985 F.3d 1107 (9th Cir. 2021) ................................................................. 6

*Ariz. Right to Life Pol. Action Comm. v. Bayless*,
   320 F.3d 1002 (9th Cir. 2003) ................................................................ 13

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) .................................................................................. 15

*Bernardo v. Planned Parenthood Fed'n of Am.*,
   115 Cal. App. 4th 322 (2004) ............................................................ 5, 6, 7

*Bose Corp. v. Consumers Union of U.S., Inc.*,
   466 U.S. 485 (1984) .................................................................................. 4

*Bradbury v. Superior Court*,
   49 Cal. App. 4th 1108, 1115, 57 Cal. Rptr. 2d 207 (1996) ................... 17

*Canatella v. California*,
   304 F.3d 843 (9th Cir. 2002) ................................................................ 13

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
   447 U.S. 557 (1980) .................................................................................. 6

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
   412 U.S. 94 (1973) .................................................................................. 12

*Desnick v. Am. Broad. Cos.*,
   44 F.3d 1345 (7th Cir. 1995) ................................................................... 8

*Dex Media West, Inc. v. City of Seattle*,
   696 F.3d 952 (9th Cir. 2012) ................................................................... 7

*Dombrowski v. Pfister*,
   380 U.S. 479 (1965) ................................................................................ 14

*Harte-Hanks Commc'ns, Inc. v. Connaughton,*
    491 U.S. 657, 667 (1989) ...................................................................................... 2, 6

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995) .............................................................................................. 12

*Joseph Burstyn, Inc. v. Wilson,*
    343 U.S. 495 (1952) ................................................................................................ 7

*Majors v. Abell,*
    317 F.3d 719 (7th Cir. 2003) ............................................................................... 14

*Mary's Kitchen v. City of Orange,*
    96 Cal. App. 5th 1009 (2023) .............................................................................. 18

*Miami Herald Publ'g Co. v. Tornillo,*
    418 U.S. 241 (1974) ............................................................................... 3, 10, 11, 12

*N.Y. Times Co. v. Sullivan,*
    376 U.S. 254 (1964) .............................................................................................. 2, 6

*Newspaper Guild of Greater Phila., Loc. 10 v. NLRB,*
    636 F.2d 550 (D.C. Cir. 1980) .............................................................................. 12

*Nike v. Kasky,*
    27 Cal. 4th 939 (2002) ............................................................................................ 7

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,*
    475 U.S. 1 (1986) .................................................................................................. 12

*Passaic Daily News v. NLRB,*
    736 F.2d 1543 (D.C. Cir. 1984) ............................................................................ 10

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.,*
    413 U.S. 376 (1973) ................................................................................................ 7

*Portman v. County of Santa Clara,*
    995 F.2d 898 (9th Cir. 1993) ................................................................................ 15

*Prager Univ. v. Google LLC,*
    951 F.3d 991 (9th Cir. 2020) .................................................................................. 9

*Reno v. Am. C.L. Union*,
    521 U.S. 844 (1997)..................................................................................12

*Santa Monica Food Not Bombs v. City of Santa Monica*,
    450 F.3d 1022 (9th Cir. 2006) ..................................................................13

*United States v. United Foods, Inc.*,
    533 U.S. 405 (2001)....................................................................................6

*Van Nuys Publ'g Co. v. City of Thousand Oaks*,
    5 Cal. 3d. 817 (1971) ................................................................................14

*Veilleux v. Nat'l Broad. Co.*,
    206 F.3d 92 (1st Cir. 2000)..........................................................................8

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988)...................................................................................14

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ...................................................................14

*Wojnarowicz v. Am. Fam. Ass'n*,
    745 F. Supp. 130 (S.D.N.Y. 1990) ..............................................................9

*Wolfson v. Brammer*,
    616 F.3d 1045 (9th Cir. 2010) ...................................................................13

**Statutes:**

Cal. Code Civ. Proc. § 425.16........................................................3, 16, 17

Cal. Prof. & Bus. Code § 17200......................................................................5

**Other Authorities:**

2 Zechariah Chafee, Government and Mass Communications 633 (1947) ...............11

Lucas A. Powe, Jr., The Fourth Estate and the Constitution 277 (1992)....................10

S. 1883, 101st Cong., 1st Sess., 135 Cong. Rec. 1207, 1217 (Apr. 13, 1989)..............9

Will Tavlin, *Under Review*, Colum. Journalist Rev. (Oct. 16, 2023) ...........................4

## STATEMENT OF INTEREST OF AMICI CURIAE

Lead amicus the **Reporters Committee for Freedom of the Press** ("Reporters Committee") is an unincorporated non-profit association founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.  Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.  The Reporters Committee regularly serves as amicus curiae in federal and California courts, involving in matters concerning government subpoenas.  *See, e.g.*, Brief of Amicus Curiae Reporters Comm. for Freedom of the Press in Supp. of Plaintiff-Appellant, *X Corp v. Bonta*, No. 24-271 (9th Cir. Feb. 21, 2024); Brief of Amicus Curiae Reporters Comm. for Freedom of the Press in Supp. of Appellees, *CoreCivic v. Candide Grp., LLC*, 20-17285 (9th Cir. Oct. 26, 2021).

**First Amendment Coalition** ("FAC") is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. FAC advances this purpose by working to improve governmental compliance with state and federal open

government laws. FAC's activities include free legal consultations on access to public records and First Amendment issues, educational programs, legislative oversight of California bills affecting access to government records and free speech, and public advocacy, including extensive litigation and appellate work. FAC's members are news organizations, law firms, libraries, civic organizations, academics, freelance journalists, bloggers, activists, and ordinary citizens.

The **Media Law Resource Center, Inc.** ("MLRC") is a non-profit professional association for content providers in all media, and for their defense lawyers, providing a wide range of resources on media and content law, as well as policy issues. These include news and analysis of legal, legislative and regulatory developments; litigation resources and practice guides; and national and international media law conferences and meetings. The MLRC also works with its membership to respond to legislative and policy proposals, and speaks to the press and public on media law and First Amendment issues. It counts as members over 125 media companies, including newspaper, magazine and book publishers, TV and radio broadcasters, and digital platforms, and over 200 law firms working in the media law field. The MLRC was founded in 1980 by leading American publishers and broadcasters to assist in defending and protecting free press rights under the First Amendment.

**News/Media Alliance** ("N/MA") represents over 2,200 diverse publishers in the U.S. and internationally, ranging from the largest news and magazine publishers to hyperlocal newspapers, and from digital-only outlets to papers who have printed news since before the Constitutional Convention. Its membership creates quality journalistic content that accounts for nearly 90 percent of daily newspaper circulation in the U.S., over 500 individual magazine brands, and dozens of digital-only properties. N/MA diligently advocates for newspapers, magazine, and digital publishers, on issues that affect them today.

Amici have a strong interest in preserving legal protections for the editorial independence of journalists and news organizations, including—and perhaps especially—with respect to opinion journalism, where editorial choices by private speakers that are perceived as unfavorable or "biased" by state actors could become the target of government scrutiny or improper enforcement actions.  Here, the Office of the Attorney of the City and County of San Francisco David Chiu ("City Attorney" or "Chiu") has issued subpoenas that, on their face, require plaintiff U.S. News & World Report L.P. ("U.S. News" or "Plaintiff") to disclose details about its methodology for ranking hospitals, out of a stated concern for perceived "bias." Because the City Attorney's subpoenas seek to intrude into the constitutionally protected process of editorial decision-making, amici urge the Court to deny the City

1   Attorney's motion to dismiss and/or to strike and grant Plaintiff's motion for

2   preliminary injunction.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION AND SUMMARY OF ARGUMENT

This is not a commercial speech case. The City Attorney has issued subpoenas concerning Plaintiff's hospital rankings that intrude directly into Plaintiff's First Amendment-protected editorial decision-making and, worse, do so because of the City Attorney's publicly stated criticism of those decisions. The City Attorney issued the subpoenas in connection with an investigation of the U.S. News rankings for alleged violations of California Business and Professions Code section 17200, *et seq.*, the "Unfair Competition Law" ("UCL"), which prohibits, among other things, misleading or deceptive commercial advertising. Compl. Ex. D (Dkt. 1-4). But the subpoenas, on their face, go well beyond the proper scope of the UCL. For example, they demand the "basis for not including measures of health equity" in the rankings; an explanation for "how, if at all, [U.S. News] has incorporated primary and preventive care" as a factor; the basis for weighting certain treatments more than others; and details about U.S. News' use of Medicare data as factors. *Id.* (Dkt. 1-4 at pp. 4–5). One interrogatory asks U.S. News to articulate its basis for stating that its "rankings are '[h]ow to find the best medical care in 2023.'" *Id.* (Dkt. 1-4 at pp. 4–5). In public statements announcing his inquiry into U.S. News' rankings, the City Attorney cited what he called "questionable methodology, bias & undisclosed financial relationships," and his view that the rankings "appear to be biased towards providing treatment for wealthy, white patients, to the detriment of poorer, sicker, or

more diverse populations[.]"  Compl. ¶¶ 53–54.  None of these avenues of inquiry—or proffered justifications for them—are permissible under the First Amendment or California law.  To conclude otherwise would open the door to improper government efforts to mandate editorial "fairness"—as state officials define it—under the guise of consumer protection.  Amici offer four points in support of U.S. News' preliminary injunction motion.

First, a news organization's *methodology* for reviews or rankings is not an appropriate topic of investigation under a state's consumer protection laws.  Decisions as to which factors to consider and the relative weighting of those factors in reviews and rankings are both inherently subjective and exercises of journalism, not commercial speech.  This is true regardless whether entities ranked also purchase advertising; the fact that for-profit media entities publish paid-for advertisements in connection with their news and entertainment programming does not, as a matter of law, affect the constitutionally protected status of their underlying content.  *Cf. N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964) ("That the Times was paid for publishing the advertisement is as immaterial [to application of the First Amendment] as is the fact that newspapers and books are sold."); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) ("If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels.").

Second, the subpoenas expressly target U.S. News based on viewpoint.  They stem from the City Attorney's stated concerns about "bias" and that the rankings may be "warping our healthcare system."  Compl. ¶ 53 & Ex. D (first subpoena); *see also id.* Ex. E (second subpoena).  This attempt to intrude into U.S. News' editorial decision-making to impose content the City Attorney deems fairer, cannot pass constitutional muster.  *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974).

Third, the City Attorney's argument that U.S. News' claims are non-justiciable is incorrect and particularly dangerous in this context.  Courts routinely permit pre-enforcement challenges alleging First Amendment harm to proceed.  And given the chilling effect of official intrusions into the editorial process, amici respectfully urge the Court to do so here.

Fourth and finally, the threat posed to a free and independent press is compounded by the City Attorney's invocation of the California anti-SLAPP law, Cal. Code Civ. Proc. § 425.16, to argue that *he* is the speaker and that U.S. News' lawsuit is an effort to silence *his* protected speech activity (i.e., issuing subpoenas to investigate U.S. News' newsgathering and editorial processes).

For all these reasons, amici urge the Court to grant U.S. News' Motion for Preliminary Injunction and deny Defendant's Motion to Dismiss and/or Strike.

# ARGUMENT

## I.   The City Attorney's subpoenas target non-commercial speech entitled to full First Amendment protection.

It is the rare news organization that does not offer some form of review or recommendation for products or services.  *See generally* Will Tavlin, *Under Review*, Colum. Journalist Rev. (Oct. 16, 2023), [perma.cc/5K6Q-9SL7] (surveying history and current state of "service journalism").[1]  Such reviews and rankings, and the methodology underlying them are entitled to full First Amendment protection.  *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 488 (1984) (applying heightened *New York Times v. Sullivan* standard to magazine's product review).  To apply less-protective commercial speech doctrine to government attempts to intrude into the editorial process that underlies such journalism would open the door to direct state intervention in public discourse in the name of consumer protection.

_____

[1]     Like reviews of restaurants and movies, product and service reviews, including rankings, are staples in many news organizations' coverage.  *See, e.g.*, *Wirecutter*, N.Y. Times, [perma.cc/4AT6-GES3] ("Wirecutter is the product recommendation service from The New York Times. . . . Whether it's finding great products or discovering helpful advice, we'll help you get it right (the first time)."); *Buyside*, Wall Street Journal, [ ] ("Best-in-class products and services we've researched, tested and reviewed."); *About Popular Mechanics*, Popular Mechanics, [perma.cc/4FVF-K7QV] (120-year old magazine serving as a leading provider of product reviews and consumer information); *About Us*, Healthline, [perma.cc/982N-8W5A] (health news website offering original content and product reviews); *Reviews*, Car and Driver, [ ] ("a print and digital magazine covering the newest car offerings, showcasing car culture, and helping people shopping for a car by serving up our unique brand of intelligence, independence, and irreverence"); *see also* Walter S. Mossberg, *Top Products in Two Decades of Tech Reviews*, Wall Street Journal, Dec. 17, 2023, [ ].

Here, the City Attorney invokes a statute meant to regulate advertising and commercial activity to investigate U.S. News' editorial choices. *See* UCL, Cal. Prof. & Bus. Code § 17200 *et seq.*; *see also Bernardo v. Planned Parenthood Fed'n of Am.*, 115 Cal. App. 4th 322, 347–48 (2004) (declining to regulate Planned Parenthood's speech under unfair competition and false advertising statutes although speech might have drawn patients to clinics). Seven of the interrogatories included in the City Attorney's subpoenas seek to intrude squarely into Plaintiff's editorial process. They demand U.S. News explain the basis for the claim that its rankings permit consumers to "find the best medical care in 2023," why it factors certain treatments and types of care into its rankings in a certain way, its reasons for not "including measures of health equity" in its rankings, how it uses certain Medicare information, and why it uses opinion surveys as the exclusive method for ranking hospitals in connection with certain specialties. Compl. Ex. D (Dkt. 1-4 at pp. 4–5). The City Attorney attempts to defend against U.S. News' First Amendment challenge by arguing that because U.S. News accepts advertising and other revenue from ranked hospitals, the rankings themselves, and U.S. News' claims as to the reliability and trustworthiness of those rankings, are commercial speech subject to regulation under the UCL. Def.'s Mot. To Dismiss & Strike ("Def.'s Mot.") at 20–21.[2] That is

---

[2] The City Attorney's argument about undisclosed revenues to U.S. News from ranked hospitals, Def.'s Mot. at 6–7, is a red herring. The primary focus of his inquiry

a weak attempt at deflection.  The subpoenas target core editorial decision-making—

how U.S. News researches, designs, and publishes its rankings—and that reporting

process, as well as Plaintiff's speech about that reporting process, is non-commercial

speech entitled to full First Amendment protection.

Commercial speech is confined to "expression related solely to the economic

interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub.*

*Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980).  It is "usually defined as speech that

does no more than propose a commercial transaction." *Bernardo*, 115 Cal. App. 4th

at 344 (citing *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)).  The

fact that a publisher has multiple grounds for publishing, some of them commercial

and some not, is not enough to diminish their First Amendment rights.  *See id.*

("'[T]he fact that [the manufacturer] ha[d] an economic motivation for mailing the

pamphlets would clearly be insufficient by itself to turn the materials into commercial

speech.' . . . Similarly here, any 'economic motivation' . . . in this case would be

insufficient by itself to turn the statements into commercial speech actionable under

---

and of the subpoenas is the *reliability* of the *methodology* underlying the hospital
rankings.  The City Attorney is focused on what he perceives to be deficiencies in the
methodology Plaintiff has chosen to create those rankings—not whether the *rankings*
are somehow themselves covert advertising *by the ranked hospitals*.  *See Cf. Ariix,*
*LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1117–18 (9th Cir. 2021) (finding alleged
extensive collusion benefiting single company qualified nutritional supplement guide
as "sham marketing scheme" and therefore proper subject of federal Lanham Act
false advertising claim but declining to rely on allegations of payments alone).

the UCL . . . ."); *N.Y. Times Co.*, 376 U.S. at 266 ("That the Times was paid for publishing the advertisement is as immaterial . . . as is the fact that newspapers and books are sold."); *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 667 (holding that "profit motive" does not "somehow strip communications of the otherwise available" First Amendment protections); *Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 960 (9th Cir. 2012) (finding Yellow Pages to be non-commercial speech subject to full First Amendment protection because economic motive alone is insufficient to characterize publication as commercial).  Were it otherwise, any state action targeted at the editorial activities of a news organization would qualify for lesser scrutiny as a commercial speech regulation.  *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 385 (1973) ("If a newspaper's profit motive were determinative, all aspects of its operations—from the selection of news stories to the choice of editorial position—would be subject to regulation if it could be established that they were conducted with a view toward increased sales."); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment.").  Simply put, a news outlet endeavoring to investigate, assess, and rank products *sold by others* is engaged in non-commercial speech, and statements about the relative quality or reliability of its

rankings are likewise non-commercial, even if the public's perception of their reliability could induce sales.

Further, under California law, for speech to be analyzed as commercial under the UCL, the speech must "*consist of factual representations* about the business operations, products, or services of the speaker." *Bernardo*, 115 Cal. App. 4th at 347 (quoting *Nike v. Kasky*, 27 Cal. 4th 939, 962 (2002)) (opinions not actionable under the UCL). But the fact that the City Attorney is seeking to compel U.S. News to provide its "basis" for making certain methodological choices in creating its rankings highlights the inherent subjectivity in such an enterprise. U.S. News says its methodology is sound; the City Attorney says that the absence of, among other things, "health equity" as a factor renders the methodology unreliable. That difference of opinion underscores the non-commercial nature of the speech targeted by the City Attorney. *See also* Letter from David Chiu, San Francisco City Attorney, to Eric Gertler, Executive Chairman and Chief Executive Officer, U.S. News & World Report, L.P. (June 20, 2023), [perma.cc/JV27-8FE3] (U.S. News' hospital rankings "suffer from poor and opaque methodology"); Chiu Press Release, *supra* (rankings "appear to be biased towards providing treatment for wealthy, white patients, to the detriment of poor, sicker, or more diverse populations").

To treat U.S. News' hospital ranking methodology and its public statements about the reliability of that methodology as commercial speech could invite similar

enforcement actions based on any news organization's claims about how it adheres to its editorial standards.  For instance, news organizations aspire to provide coverage that is objective, but "arguments about objectivity are endless."  *Policies and Standards*, Wash. Post (Jan. 1, 2021), [perma.cc/WN8X-CFMX].  For just that reason, federal courts have routinely concluded that representations about how reporting will be conducted cannot be enforced through the law of fraud or contract without posing grave First Amendment risks.  *See, e.g.*, *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 121–23 (1st Cir. 2000); *Desnick v. Am. Broad. Cos.*, 44 F.3d 1345, 1354–55 (7th Cir. 1995); *see also Prager Univ. v. Google LLC*, 951 F.3d 991, 999–1000 (9th Cir. 2020) (concluding that statements related to YouTube's content moderation standards are not commercial speech under Lanham Act).

Indeed, the courts and Congress, in the false advertising context, have recognized as much specifically with respect to consumer recommendations by news organizations.  In extending the Lanham Act to product disparagement, Congress expressly intended to exclude publications that "raise free speech concerns, such as a Consumer Report which reviews and may disparage the quality . . . of products . . . ." *See Wojnarowicz v. Am. Fam. Ass'n*, 745 F. Supp. 130, 142 (S.D.N.Y. 1990) (quoting S. 1883, 101st Cong., 1st Sess., 135 Cong. Rec. 1207, 1217 (Apr. 13, 1989)).  That law "has never been applied to stifle criticism of the goods or services of another by one, such as a consumer advocate, who is not engaged in marketing or promoting a

9

competitive product or service." *Id.* at 141–42 (citing cases).  By claiming authority

under California law to regulate U.S. News's hospital rankings as mere commercial

speech, subject to lesser First Amendment protection, the City Attorney's regulatory

intervention risks stifling the flow of valuable reporting to the public.

To be sure, the protection of consumers is a legitimate state interest.  But

regardless of "how beneficent-sounding the purposes of controlling the press might

be, we prefer the power of reason as applied through public discussion and remain

intensely skeptical about those measures that would allow government to insinuate

itself into the editorial rooms of this Nation's press." *Tornillo*, 418 U.S. at 259

(internal quotations omitted) (White, J., concurring).  Repackaging a difference of

opinion between a government official and news outlet over editorial choices as a

violation of consumer protection laws carries the acute risk that states will use such

laws to sway public discourse in its favor—and undercut the independence the First

Amendment was enacted to protect.

## II.    The City Attorney cannot target a news outlet with subpoenas because he disagrees with its editorial viewpoint.

In 1974, the Supreme Court unanimously affirmed that the First Amendment

forbids governmental interference in the editorial decision-making of the press,

holding unconstitutional Florida's "right of reply" statute, which "grant[ed] a political

candidate a right to equal space to reply to criticism and attacks on his record by a

newspaper." *Tornillo*, 418 U.S. at 243.  In *Tornillo*, the Court found that any such

intrusion "[c]ompelling editors or publishers to publish that which reason tells them should not be published" would violate the First Amendment regardless of motive. *Id.* at 256 (internal quotation marks omitted).  This right to editorial independence has often been called "absolute."  *Passaic Daily News v. NLRB*, 736 F.2d 1543, 1557 (D.C. Cir. 1984); Lucas A. Powe, Jr., The Fourth Estate and the Constitution 277 (1992) ("Because editorial autonomy is indivisible, it must be absolute.").

The City Attorney purports to justify the subpoenas by citing concerns about the equity of U.S. News' hospital rankings.  Press Release, David Chiu, San Francisco City Attorney, U.S. News & World Report Faces Legal Scrutiny Over Dubious Hospital Rankings, (June 20, 2023), [perma.cc/K9CS-38AJ].  But whatever validity those concerns do or do not have, *Tornillo* makes clear that editorial fairness—however desirable—"cannot be legislated."  418 U.S. at 256.  Instead, the First Amendment requires that society "take the risk that occasionally debate on vital matters will not be comprehensive and that all viewpoints may not be expressed" to avoid the far graver risk of government censorship.  *Id.* at 260 (White, J., concurring). A contrary approach would "bring[] about a confrontation with the express provisions of the First Amendment and the judicial gloss on that Amendment developed over the years."  *Id.* at 254.

Writing for the majority in *Tornillo*, Chief Justice Burger described two main consequences of government intrusion in editorial decision-making.  First, public

discourse "would be blunted or reduced" as editors took "the safe course . . . to avoid controversy." *Id.* at 257.  Second, government-enforced editorial fairness would directly violate "the unexceptionable, but nonetheless timeless" principle "[w]oven into the fabric of the First Amendment" that "liberty of the press is in peril as soon as the government tries to compel what is to go into a newspaper." *Id.* at 261 (quoting 2 Zechariah Chafee, Government and Mass Communications 633 (1947)).  That fundamental logic—that the government may not substitute its own editorial viewpoint for a private party's—remains of central importance to the press.[3]

A publisher's freedom to articulate its views "lies at the core of publishing control," a reflection of a news organization's "untrammeled authority to set standards of workmanship that determine its intrinsic excellence and its quality and public character." *Newspaper Guild of Greater Phila., Loc. 10 v. NLRB*, 636 F.2d 550, 560–62, 567 (D.C. Cir. 1980) (MacKinnon, J., concurring).  Or as Chief Justice Burger put it in *Tornillo*, a private publisher's power "to advance its own political, social, and economic views" is bound only by "financial success; and . . . the journalistic integrity of its editors and publishers." *Columbia Broad. Sys., Inc. v.*

---

[3]     The Supreme Court has since applied the First Amendment protection recognized in *Tornillo* to other forms of communication.  *See Reno v. Am. C.L. Union*, 521 U.S. 844, 870 (1997) (the internet); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) (parades); *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 11 (1986) (private company's billing envelopes).

*Democratic Nat'l Comm.*, 412 U.S. 94, 117 (1973) (plurality opinion).  Under this well-settled law, the City Attorney's subpoenas cannot survive legal scrutiny.

**III.    U.S. News' action to vindicate its First Amendment rights is ripe.**

The City Attorney and his local government amici argue that because the subpoenas issued to U.S. News have not yet been enforced, Plaintiff's constitutional challenge is not ripe.  That argument does not square with precedent.

It is well settled that "[a]lthough the mere existence of a statute is insufficient to create a ripe controversy" the Ninth Circuit applies the justiciability "requirements of ripeness and standing less stringently in the context of First Amendment claims." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010) (citations omitted).  To avoid the chilling effect of adverse government action, "one need not await 'consummation of threatened injury' before challenging a statute restricting speech." *Id.*; *see also LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1156 (9th Cir. 2000) ("our finding of a reasonable threat of prosecution . . . dispenses with any ripeness problem"); *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1034 (9th Cir. 2006) (finding that plaintiff's "apprehension that the Events Ordinance would be enforced against it for engaging in activities protected by the First Amendment without a permit is sufficient to establish an injury-in-fact").  The prudential requirements for ripeness and standing were relaxed "in recognition that 'the First Amendment needs breathing space.'"  *Canatella v. California*, 304 F.3d 843, 853

(9th Cir. 2002) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)).  And

this relaxed justiciability standard is itself an essential First Amendment protection.

*See Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1007 & n.6 (9th

Cir. 2003) ("[I]t would turn respect for the law on its head for us to conclude that

[plaintiff] lacks standing to challenge the provision [regulating political advertising]

merely because [plaintiff] chose to comply with the statute and challenge its

constitutionality, rather than to violate the law and await an enforcement action.");

*Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) ("A plaintiff who mounts a pre-

enforcement challenge to a statute that he claims violates his freedom of speech need

not show that the authorities have threatened to prosecute him . . . ; the threat is latent

in the existence of the statute." (internal citations omitted)).

It is widely recognized that the possibility of an enforcement action based on

the exercise of editorial discretion presents a profound risk of chilling the exercise of

First Amendment rights.  *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393

(1988) ("[T]he alleged danger of this statute is, in large measure, one of self-

censorship; a harm that can be realized even without an actual prosecution.").[4]  That

---

[4]      In addressing the merits of a plaintiff's civil rights claims arising out of an
agency investigation, the Ninth Circuit recognized the potential chilling effect that
such investigations—even when they do not lead to seizures of materials or eventual
sanctions—can have on speakers.  *See White v. Lee*, 227 F.3d 1214, 1228 (9th Cir.
2000) ("The investigation by the HUD officials unquestionably chilled the plaintiffs'
exercise of their First Amendment rights. It is true that the agency did not ban or

threatened chill is an injury sufficient to confer standing in a pre-enforcement

challenge.  *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965) ("The chilling effect

upon the exercise of First Amendment rights may derive from the fact of the

prosecution, unaffected by the prospects of its success or failure.").  This justiciability

standard is an essential protection for the press and other speakers; were it otherwise

"[o]nly the stout-hearted will brave prosecution for the sake of publication."  *Van*

*Nuys Publ'g Co. v. City of Thousand Oaks*, 5 Cal. 3d. 817, 828 (1971).

Here, the City Attorney and his local government amici argue that this matter is

not ripe, in part, because the City Attorney has not gone to court yet to enforce the

subpoenas.  Defs.' Mot. at 8; Local Gov't Amici Br. at 4.  The City Attorney further

suggests that because he possesses inherent discretion to investigate violations of law,

his investigation of U.S. News should be insulated from constitutional challenge.

Defs.' Mot. at 7–11.  And local government amici warn that governments will be

generally deterred from fulfilling their investigatory functions should this Court

consider U.S. News' pre-enforcement First Amendment challenge to the City

Attorney's subpoenas.  Local Gov't Amici Br. at 10.  These arguments ignore the

facts of this particular case, and the body of law regarding justiciability in the First

---

seize the plaintiffs' materials, and officials in Washington ultimately decided not to
pursue either criminal or civil sanctions against them. But in the First Amendment
context . . . informal measures, such as 'the threat of invoking legal sanctions and
other means of coercion, persuasion, and intimidation,' can violate the First
Amendment also.") (citations omitted).

Amendment context.  Courts have recognized that government threats—even absent direct government authority to take some action—can violate the First Amendment. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) ("But though the Commission is limited to informal sanctions—the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation—the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim.").

While the ripeness requirement serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements," this Court is at no risk of doing so here.  *Portman v. County of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993) (citation omitted).  The subpoenas, on their face, clearly seek to intrude into U.S. News' editorial decision-making, *supra* at 5, and neither the rankings nor U.S. News' speech about its rankings are commercial speech subject to the UCL, *supra* at 5-9.  Under these circumstances, the law does not force U.S. News to wait and see whether the City Attorney will seek to force it to comply with subpoenas improperly seeking the disclosure of details, including confidential ones, about U.S. News' editorial processes.  There is ample precedent to support the ripeness of its pre-enforcement challenge to those subpoenas.

**IV.    California's anti-SLAPP law is not a sword to be wielded by government officials to defend subpoenas to news organizations.**

In response to U.S. News' Complaint and Motion for Preliminary Injunction, the City Attorney filed a Motion to Strike pursuant to California's anti-SLAPP statute, Cal. Code Civ. Proc. § 425.16.  The gist of Defendant's Motion to Strike is that U.S. News' lawsuit is a SLAPP intended to silence the City Attorney's protected speech activity—namely, issuing subpoenas to U.S. News.  Def.'s Mot. at 30–36. U.S. News does not assert a claim for defamation—or any other speech-suppressive tort—nor does the City Attorney deny that the mere issuance of the subpoenas is the only purported protected activity upon which his Motion to Strike is based.  *Id.* at 31–37.  Defendant seeks an award of attorney's fees and costs under the anti-SLAPP statute from U.S. News for challenging the subpoenas on First Amendment grounds.

This invocation of California's anti-SLAPP law is not a cognizable one.  When California enacted its anti-SLAPP statute in 1992, it sought to safeguard the "valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances" from the chilling effect of non-meritorious litigation against the press and other speakers.  Cal. Civ. Proc. Code § 425.16(a). The California Legislature recognized "that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process." *Id.*  To permit a government official to commandeer that statute to prevent a news outlet—one of the types of speakers the

statute was enacted expressly to protect, *id.*—from challenging subpoenas as violative of its First Amendment rights would turn the purpose of the law on its head.

The City Attorney argues, in essence, that the subpoenas are an act of speech and petition, and that because the anti-SLAPP statute can, under certain circumstances, apply to government actors engaged in their official duties, a legal challenge to the execution of those duties is a SLAPP.  Def.'s Mot. At 30–43.  But the California Court of Appeal recently rejected that very argument, holding that the anti-SLAPP statute did not apply to a claim that a city council had violated the open meetings law by taking action during a closed session without proper notice to the public.  *Mary's Kitchen v. City of Orange*, 96 Cal. App. 5th 1009 (2023).  The court found that the claim arose from the city council's unprotected conduct of making a collective decision to take "a governing action"—not First Amendment protected activity within the scope of the anti-SLAPP statute.  *Id.* at 1017.  It explained, "we interpret the complaint as arising from unprotected action . . . and the fact that the agenda had not given proper notice of that action."  *Id.*  Therefore, the complaint was not based on any protected speech, even if certain speech—such as "the conversation the city council had with the city attorney" in closed session—might be relevant to resolution of the complaint.  *Id.*

The City Attorney strips the SLAPP statute of its purpose and context, and relies solely on caselaw arising in the defamation context, where courts reached the

18

noncontroversial conclusion, consistent with the law's purpose, that the government should be able to issue statements and explain its actions without fear of unmeritorious libel suits.[5]  None of the cases cited by the City Attorney supports the argument that a government official or entity may seek dismissal and an award of fees against a news outlet for challenging the issuance of government process that the news outlet contends runs afoul of its First Amendment rights.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to grant Plaintiff's Motion for Preliminary Injunction and deny Defendant's Motion to Dismiss and/or to Strike.

Dated: March 20, 2024                                 Respectfully submitted,


                                                      */s/ Katie Townsend*
                                                      Katie Townsend (SBN 254321)
                                                      *Counsel for amici curiae*

---

[5]      For example, the City Attorney cites *Bradbury v. Superior Court*, in which a county sheriff filed a lawsuit against law enforcement entities that had issued a public report referencing the sheriff's conduct in executing a warrant.  The agencies moved to dismiss the claims based on their public statements under the anti-SLAPP law.  The Court of Appeal held that "if government has a legitimate role to play in the interchange of ideas—as we conclude it does—then government should have some measure of protection in performing that role, at least as to matters of public interest.  Otherwise, if government is compelled to guarantee the truth of its factual assertions on matters of public interest, its speech would be substantially inhibited, and the citizenry would be less informed."  49 Cal. App. 4th 1108, 1115, 57 Cal. Rptr. 2d 207 (1996), as modified on denial of reh'g (Oct. 31, 1996)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gabe Rottman
Mara Gassmann
Emily Hockett
*Of counsel*
THE REPORTERS
COMMITTEE FOR FREEDOM
OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Telephone: 202.795.9300
Facsimile: 202.795.9310
Email: ktownsend@rcfp.org

PROPOSED BRIEF OF AMICI CURIAE MEDIA ORGANIZATIONS IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS AND TO STRIKE - CASE NO. 3:24-cv-00395-WHO